[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-11840; 12-15331
_____

D.C. Docket No. 6:06-cv-01757-DAB

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE AND CASUALTY COMPANY,

Plaintiffs - Counter Defendants - Appellants,

versus

REIDY WILLIAMS,
EARL BYERS,

Intervenor Defendants - Counter Claimants - Appellees,

JERLEAN REED,

Intervenor Defendant - Consol. Counter Claimant -
Counter Claimant - Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 15, 2014)

Before TJOFLAT, FAY, and ALARCÓN,[*] Circuit Judges.

PER CURIAM:

This is the second appeal arising from a scheme by Physicians Injury Care Center, Inc. ("PICC") to submit fraudulent insurance claims to State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm"). Reidy Williams, Earl Byers, and Jerlean Reed (collectively, "Intervenors") intervened and alleged that, when State Farm stopped paying the fraudulent bills submitted by PICC, it did not comply with the statutory requirements to withdraw their Florida Personal Injury Protection ("PIP") insurance benefits. An intervening change in controlling authority causes us to depart from our previous opinion and reinstate the jury verdict in its entirety.

## I. BACKGROUND

A. PICC's Fraud

State Farm sued PICC in November 2006 and alleged it had "unlawfully obtained personal injury protection benefits . . . from State Farm by push[ing] State Farm's insureds through a sham course of treatment and evaluation designed specifically to exhaust the patients' insurance benefits." *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.* (*PICC*), 427 F. App'x 714, 717 (11th Cir. 2011) (internal quotation marks omitted). State Farm presented extensive

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

evidence of pervasive billing fraud at trial. Car-accident victims were referred to PICC for treatment. Rather than basing diagnoses and treatments on the injuries of each patient, the doctors at PICC gave predetermined diagnoses and treatments that nearly exhausted the patients' $10,000 in PIP benefits.[1] After trial,[2] a jury found that PICC's conduct amounted to fraud and found PICC was liable for damages for the fraudulent claims submitted. The jury also found State Farm was entitled to a declaration it was not liable for any unpaid claims from treatment at PICC.

B. Intervenors' Claims Against State Farm

Intervenors were policy holders with State Farm that suffered injuries from car accidents in 2006. They received post-accident treatment at PICC and, as insureds commonly do, assigned their rights to receive PIP benefits to PICC in exchange for treatment. State Farm made initial payments, but the payments ceased once State Farm filed suit challenging PICC's fraudulent bills.

After it filed suit against PICC, State Farm sent letters to its insureds that had received treatment at PICC. The letters sent to Intervenors stated State Farm would "accept[] responsibility . . . for liability ultimately determined to be ow[ed] for [PICC's] services provided to [Intervenors]." The letters further requested that Intervenors not assume more liabilities by receiving further treatment at PICC.

---

[1] Under the Florida Motor Vehicle No-Fault Law ("No Fault Law"), Fla. Stat. §§ 627.730–627.7405, car-accident victims that have purchased the mandatory PIP coverage have $10,000 in coverage for personal injuries resulting from car accidents. Fla. Stat. § 627.736(1).

[2] There were two trials; the first resulted in a mistrial.

3

Shortly after receiving the letters indemnifying them for PICC's claims, Intervenors each revoked their assignment of PIP benefits to PICC. The Intervenors also moved to intervene in the case against PICC to assert breach-of-contract counterclaims against State Farm for its improper withdrawal of their PIP benefits. The district court granted the motions. At trial, the jury found State Farm was not liable for the unpaid claims accrued by Intervenors.

C. Resolution of the First Appeal

In the first appeal, we affirmed the judgment of the district court with the exception of Intervenors' breach-of-contract counterclaims and the declaratory judgment against them. *PICC*, 427 F. App'x at 725–26. We determined that Intervenors were entitled to recover damages, because State Farm violated section 627.736(7)(a) of the Florida Statutes, when it withdrew payment to PICC without first obtaining consent or an independent medical report showing that Intervenors were not receiving appropriate treatment. *Id.* at 723–25. The case was remanded for a computation of damages. *Id.* at 725. The district court awarded $15,741, plus interest, in damages, based upon unpaid bills attributed to Intervenors, and determined that $11,000 in attorneys' fees was appropriate. This appeal followed.

## II. DISCUSSION

4

State Farm asks us to revisit our decision in the first appeal that they violated subsection 7(a),[3] when they withdrew payment to PICC without first obtaining a proper medical report.  State Farm also argues (1) Intervenors lack standing, (2) the computation of damages was erroneous, and (3) the damages awarded to Intervenors should be offset from those awarded to State Farm from PICC.  Intervenors reply that the law-of-the-case doctrine prohibits reconsideration of the issues raised by State Farm that previously were decided by this court.  They cross-appeal and seek at least $2.4 million in attorneys' fees.

A. Law of the Case

We initially address the effect of our first decision on this appeal.  State Farm's arguments that they did not violate subsection 7(a) and that Intervenors lack standing both were decided previously and implicate the law-of-the-case doctrine.  Under the law-of-the-case doctrine, when a court decides an issue of law, that decision is generally binding in subsequent proceedings.  *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005).  The doctrine applies to issues decided both expressly and by necessary implication.  *Id.*  "The doctrine, however, does not limit the court's power to revisit previously decided issues when (1) new and substantially different evidence emerges at a subsequent trial; (2) controlling authority has been rendered that is contrary to the previous decision; or

---

[3] "Subsection" refers to subdivisions of section 627.736 of the Florida Statutes.

5

(3) the earlier ruling was clearly erroneous and would work a manifest injustice if implemented." *Klay v. All Defendants*, 389 F.3d 1191, 1197–98 (11th Cir. 2004).

Regarding State Farm's assertion that Intervenors lack standing, State Farm raised this argument in the first appeal. We decided otherwise by necessary implication.[4] Because State Farm has not explained which, if any, of the exceptions to the law of the case apply to this issue, we decline to revisit it.

We based our decision that State Farm violated subsection 7(a) primarily on our reading of the report requirement of the statute. The decision also was based on our interpretation that Florida law required mechanical compliance with the No-Fault Law's provisions for withdrawing payment, even when there is billing fraud. *See United Auto. Ins. Co. v. Viles*, 726 So. 2d 320 (Fla. 3d Dist. Ct. App. 1998). Since our previous opinion, a Florida appellate court has issued a decision that places our ruling on this issue in doubt. *Chiropractic One, Inc. v. State Farm Mut. Auto.*, 92 So. 3d 871 (Fla. 5th Dist. Ct. App. 2012). As a federal court sitting in diversity, the decisions of Florida's District Courts of Appeal control our

---

[4] State Farm argued that Intervenors did not have the right to seek their PIP benefits until they revoked their assignment to PICC. True enough; Intervenors did not have a basis for *intervention* until they revoked their assignment of benefits, but that does not control whether they had *standing* to bring the claim. Because this is a diversity action, the question is whether State Farm's conduct threatened the rights of Intervenors as defined by Florida law. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005) (explaining that whether there is a legally enforceable right under state law sufficient to confer standing is determined by state law). State Farm's alleged breach of Intervenors' insurance contract injured interests protected by state law. *See Allstate Ins. Co. v. Kaklamanos*, 843 So. 2d 885, 896–97 (Fla. 2003) (recognizing an insured may sue a defaulting insurer to force compliance with statutory mandates for PIP benefits). As the district court noted, State Farm vehemently argued in state court that Intervenors' injuries under state law could be resolved as part of this case.

application of Florida law, absent persuasive authority the Florida Supreme Court would decide otherwise. *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005). This intervening change in controlling authority merits an exception to the law-of-the-case doctrine. Consequently, we again must evaluate whether State Farm was required to obtain a medical report prior to withholding payment for PICC's fraudulent claims.

B. Application of Subsection 7(a)'s Report Requirement

We review the denial of a motion for judgment as a matter of law de novo and apply the same standard as the district court. *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). The interpretation of a statutory provision is a purely legal issue that is resolved by the court. *Cox Enters., Inc. v. Pension Benefit Guar. Corp.*, 666 F.3d 697, 701 (11th Cir. 2012).

Florida's No-Fault Law places certain restrictions on both the claims process and on the ability of insurers to refuse to pay benefits. This appeal turns on the distinction between the insurer's ability to deny benefits and its ability to withdraw benefits. In a usual case, the essential difference between a withdrawal of benefits and denial of benefits is that, in a withdrawal, the insurer first has made a payment but refused to make more payments. *State Farm Mut. Auto. Ins. Co. v. Hyma Med. Ctr., Inc.*, 22 So. 3d 699, 701 (Fla. 3d Dist. Ct. App. 2009); *see also United Auto. Ins. Co. v. Santa Fe Med. Ctr.*, 21 So. 3d 60, 65 (Fla. 3d Dist. Ct. App. 2009) (en

7

banc); *State Farm Mut. Auto. Ins. Co. v. Rhodes & Anderson, D.C., P.A.*, 18 So. 3d

1059, 1063–64 (Fla. 2d Dist. Ct. App. 2008).  And, an outright denial would

involve no payment before the refusal.  *Hyma Med. Ctr.*, 22 So. 3d at 700.

The withdrawal of PIP benefits is governed by subsection 7(a).  Subsection

7(a) provides:

> (7) MENTAL AND PHYSICAL EXAMINATION OF INJURED PERSON; REPORTS.
> (a) Whenever the mental or physical condition of an injured person covered by personal injury protection is material to any claim that has been or may be made for past or future personal injury protection insurance benefits, such person shall, upon the request of an insurer, submit to mental or physical examination by a physician or physicians. . . . An insurer may not **withdraw** payment of a treating physician without the consent of the injured person covered by the personal injury protection, **unless the insurer first obtains a valid report by a Florida physician** . . . stating that treatment was not reasonable, related, or necessary.

Fla. Stat. § 627.736(7)(a) (emphasis added).  In short, usually before an insurer

may withdraw PIP benefits, it must obtain a valid report by a licensed physician

indicating the treatment was not reasonable, related, or necessary.

The denial of benefits, however, implicates subsection 4(b).  Subsection 4(b)

requires insurers to pay valid claims within 30 days or face a penalty.  An insurer

may elect to deny a claim under subsection 4(b), when it has "reasonable proof to

establish that the insurer is not responsible for the payment."  *Id.* § 627.736(4)(b)4

8

(2006).[5]  Moreover, regardless of whether an insurer initially denies a claim under subsection 4(b), it may still assert the claim was made in violation of subsection 5(b).  *See id.* § 627.736(4)(b)6.  In relevant part, subsection 5(b) provides that "[a]n insurer or insured is not required to pay a claim or charges . . . [t]o any person who knowingly submits a false or misleading statement relating to the claim or charges."  *Id.* § 627.736(5)(b)1.c.  Because the denial of benefits under subsection 5(b) does not implicate subsection 7(a), an insurer is not required to obtain a report before refusing to pay benefits.

*Viles* involved a PIP claim, where the insurance company refused to pay chiropractic bills for the insured on the grounds that the "bills were fraudulent and not reasonably related to the accident in question."  726 So. 2d at 320.  The insurer initially had paid some of the bills before withdrawing PIP benefits.  The insured sued for $3,632, the entirety of the unpaid bills, but a jury found the insured "had sustained reasonable and necessary medical bills of only $2,000."  *Id.* at 321.  The appellate court held that a subsection 7(a) medical report is a "statutory condition precedent" to the withdrawal of PIP benefits.  *Id.*  Because the insurer had not obtained the report before withdrawing benefits, the court concluded it was barred from asserting the bills were not reasonable or necessary.  *Id.*  Therefore, the insurer was liable for the entire amount of the unpaid bills.  *Id.*

---

[5] A 2012 amendment struck "to establish" but left the provision substantively intact.  *See* 2012 Fla. Laws Ch. 2012-197.

9

We originally interpreted *Viles* to mean that, if an insurer pays a portion of a claim, then it is required to obtain a report to discontinue payment. *PICC*, 427 F. App'x at 724–25. While *Viles* was the only relevant decision that dealt with fraud, it did not distinguish between withdrawals, when the claims were not reasonable or necessary, and those caused by the fraud of the claimant. We reluctantly determined that an insurer is required to comply with the statutory requirement to obtain a report, even where a care provider knowingly submitted fraudulent claims. *Id.*

After our decision, a Florida appellate court issued a new opinion that addressed fraudulent claims submitted by a care provider. *Chiropractic One, Inc. v. State Farm Mut. Auto.*, 92 So. 3d 871 (Fla. 5th Dist. Ct. App. 2012). *Chiropractic One* involved the submission of admittedly fraudulent claims by a provider to the insurer. *Id.* at 873. The insurer had denied the claims for fraud. The provider argued subsection 4(b) required that the insurer investigate each claim and provide comprehensive written explanations for the denial of each claim submitted by the provider, even where the provider was engaged in pervasive billing fraud. *Id.* The court rejected that argument. It concluded subsection 5(b)1.c relieves both insurers and insureds from paying fraudulent charges and claims submitted by providers. *Id.* at 874. Moreover, fraud in a single charge was sufficient to poison the "entire 'claim,' i.e., the collective of all charges." *Id.*

10

Subsection 5(b)1.c was enacted by the Florida Legislature in a 2003 revision of the No-Fault Law, which is long after *Viles*. Florida Motor Vehicle Insurance Affordability Act, 2003 Fla. Laws Ch. 2003-411. The "plain language of [subsection 5(b)1.c] supports the invalidation of . . . claims" accompanied by knowingly false or misleading statements. *Chiropractic One*, 92 So. 3d at 874. As the *Chiropractic One* court stated:

> The [2003] revision of the PIP statute had as a goal, among other things, the curtailment of the perceived fraud in the PIP billing of medical services. It is perfectly consistent with that goal for the Legislature to intend to invalidate a billed claim if there is any knowing submission of false or misleading statements relating to the claim or charges submitted by a provider. We conclude, therefore, that section 627.736(5)(b)1.c. should be interpreted in that fashion.

*Id.* at 875.

Given the decision in *Chiropractic One*, we conclude that, to the extent *Viles* places obligations on insurers confronted with billing fraud, it is inapplicable. *Viles* predated the relevant 2003 amendment to the No-Fault Law and other continuing attempts by the Florida Legislature to deal with widespread billing fraud. Moreover, there was no discussion in *Viles* of how fraud specifically affects the statutory obligations imposed on insurers. It also did not deal with the practical differences in claims submitted by providers rather than insureds. While it appears that *Viles* is still good law in run-of-the-mill withdrawal cases, it has no application in those involving complex and pervasive billing fraud.

11

We interpret *Chiropractic One* to stand for the proposition that insurers need not mechanically adhere to subsection 4(b)'s investigative requirement, when knowing billing fraud is involved. Similarly, rote compliance with subsection 7(a)'s requirement to obtain a report before terminating all PIP benefits is unnecessary, when an insurer seeks only to deny all claims coming from a fraudulent provider.

We are unconvinced this appeal actually embodies a traditional withdrawal case. While State Farm did make initial payments for Intervenors' claims, those payments were induced by PICC's knowingly fraudulent submissions. As the *Chiropractic One* court explained, knowingly fraudulent PIP claims are invalidated under Subsection 5(b)1.c. *Id.* at 874–75. The initial payments therefore were ineffective, making this a case of denied PIP benefits. Denial cases are governed by subsection 4(b) and do not require a report as do withdrawals under subsection 7(a). State Farm was required only to have "reasonable proof" they were not responsible for the payment, because obligations imposed by other parts of subsection 4(b) are vitiated by the fraud. *See id.* at 873–74.

Moreover, once PICC fraudulently submitted Intervenors' claims, they were invalidated. Because fraud invalidated the submitted claims, the subsequent revocation of the assignment of PIP benefits by Intervenors provided them with the

hollow right to pursue claims that were no longer payable. The revocation did not eliminate the fraud infesting and invalidating the claims.

Finally, it makes little sense that an insurer would be required to obtain an individualized medical assessment for each claim, when the denial is based on wholesale billing fraud by the provider. The blanket denial of claims coming from a fraudulent care provider is markedly different from a withdrawal of benefits from a single insured. Intervenors still could have sought treatment with other providers and, because State Farm indemnified them from potential claims from PICC of unpaid bills, they suffered no ill effect from the denial.

### III. CONCLUSION

This case involves wholesale, knowing, and systematic billing fraud by care providers. In general, Florida's No-Fault Law imposes substantial procedural safeguards to protect insureds and the system as a whole. But once PICC submitted fraudulent claims to State Farm, the claims were invalidated and unpayable. Intervenors' eleventh-hour revocations of the assigned PIP benefits do not now render them payable. Accordingly, we reverse our previous grant of judgment as a matter of law, reinstate the jury verdict in its entirety, and, consequently, vacate the awards of damages and attorneys' fees for Intervenors.[6]

---

[6] Given the disposition in favor of State Farm, we need not address the issues raised in Intervenors' cross-appeal.

The matter is remanded with instructions to enter judgment in favor of State Farm as to all claims.

**REVERSED in part, VACATED in part, and REMANDED with instructions.**